UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CASSANDRA WILLIS-ABNER,
individually and as next friend of
LAWRENCE ABNER, II,

        Plaintiffs,                          Civil Action No.
                                                07-CV-12936
vs.
                                                HON. BERNARD A. FRIEDMAN

OFC. PARSONS,

        Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the court on defendant's motion for summary judgment [docket entry 24]. Plaintiffs have filed a response in opposition and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(e)(2), the court shall decide this motion without oral argument.

The relevant facts in this matter are not in dispute. On July 31, 2004, Plaintiff Cassandra Willis-Abner was driving on Grand River Avenue through Farmington Hills, Michigan, when she was pulled over by a Farmington Hills police car driven by defendant Parsons. Plaintiff's female friend was in the passenger seat and plaintiff's two young children were in the back seat. The four were driving to a children's birthday party. Parsons stopped plaintiff because he ran her license plate through the Law Enforcement Information Network ("LEIN") and learned that the vehicle, which was registered to plaintiff's husband, was stolen. In fact, the car had been stolen from plaintiff's driveway in May 2004. Plaintiff reported the theft to the police department in Redford Township, where she and her husband lived at that time. Within a week, Detroit police

officers found the car in an alley in that city and returned it to plaintiff's husband. Apparently neither police department updated the LEIN to reflect the fact that the car had been recovered. When Parsons ran the license plate, the LEIN therefore still reported this as a "stolen vehicle."

Parsons requested back-up and other officers arrived. Audio and video recordings of the stop have been submitted on compact discs as Exhibit 9 to defendant's motion. Defendant's digital recording of the stop has been summarized as follows by an internal Farmington Hills police report (dft's Ex. 7):

> At 1710 Ofc. Parsons can be heard on the PA of his patrol car stating "Driver, shut the vehicle off" and "drop the keys out the window for me, please." Ms. Willis-Abner can be observed dropping a set of keys out of the window onto the ground.
>
> Ofc. Parsons stated "open the door and step out." Ms. Willis-Abner exited the SUV, facing Ofc. Parsons' patrol car. Ofc. Parsons can be heard saying "face forward, face forward. I'm not kidding you, I'll kill you right here. Turn around, your cars stolen. Turn around, turn around, turn around. Hands up. Face the front of your truck. You will die right here if you don't face the front of your truck." Ms. Willis-Abner continues to face towards Ofc. Parsons' patrol car and has a confused look on her face, extends her arms, and shrugs her shoulders. Ofc. Parsons says "the front of your truck. Walk back towards me, backwards towards me. Stop. Down on your knees. That's fine, we'll figure it out." Ms. Willis-Abner can be heard stating that her kids were in the car and that her car had been stolen.
>
> At 1712 the front seat passenger, Ms. Jones is removed from the vehicle out of camera view.
>
> At 1713 Ofc. Parsons and Ofc. Kemp approach the SUV. Both officers have their pistols in there hands pointed at the ground. After approaching the SUV both officers holster their pistols. Ofc. Parsons can be heard speaking to the children in the car about going to a birthday party. Ofc. Parsons returned to his vehicle and Ofc. Kemp remained at the SUV with the two children. Both front doors of the SUV were open.
>
> At 1718 a silver SUV pulled into the lot. The driver of the silver

2

> SUV (later identified as Ms. Jones' husband Clarence Jones) approached Ofc. Kemp and immediately removed the two children from the SUV.
>
> At 1720 Ms. Willis-Abner and Ms. Jones can be seen on camera. Ofc. Parsons and Ms. Willis-Abner can be heard discussing why the plate on the SUV was run by Ofc. Parsons, why the SUV was still listed as stolen, why a high-risk felony stop was conducted, how the vehicle could be removed from LEIN, and how Ms. Willis-Abner was confused by Ofc. Parsons directions.
>
> At 1730 Ofc. Parsons cleared the scene (the black and silver SUVs were still in the lot).

In addition to making unwarranted threats to shoot and kill her, plaintiff alleges that Parsons handcuffed her too tightly; that he placed her in his patrol car and "rolled the windows completely up in 80 degree heat in order to further penalize and punish" her; that he ignored her requests to loosen the handcuffs and roll down the windows; that he "saw the balloons and was aware that Plaintiffs posed no threat nor her children but nevertheless continued to point loaded weapons at them and shout death threats"; and that his actions, and those of the other officers, traumatized the children. Complaint ¶¶ 16, 21, 24, 30.

Plaintiffs in this matter are Willis-Abner and one of her two children, Lawrence Abner, II, who was in the back seat of the car. Their complaint asserts seven claims. The first, brought under 42 U.S.C. § 1983, alleges that defendant violated plaintiffs' fourth and fourteenth amendment rights "to be free from unreasonable seizure and excessive force." *Id.* ¶ 32. The second, also brought under § 1983, alleges that defendant violated plaintiffs' fourth amendment right "to be free from unreasonable seizures." *Id.* ¶ 35. The third, apparently brought under state law, alleges that defendant restrained plaintiffs' liberty and freedom of movement, unlawfully and without probable cause. *Id.* ¶¶ 38-39. The fourth, labeled "assault-excessive force," alleges that defendant

3

used excessive force against plaintiffs by threatening to kill plaintiff Willis-Abner, pointing his gun at both plaintiffs, and not giving plaintiff Willis-Abner sufficient air or loosening her handcuffs. *Id.* ¶¶ 43-44. The fifth, labeled "battery-excessive force," is a state law battery claim based on the same conduct relating to the fourth claim. *Id.* ¶ 49. The sixth and seventh claims, respectively, are for intentional and reckless infliction of emotional distress. *Id.* ¶¶ 52-55, 57-60.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a properly supported summary judgment motion has been filed, the burden shifts to the party opposing the motion to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence "in the light most favorable to the opposing party," *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson*, 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

Having reviewed the complaint, the parties' briefs, and all of the exhibits, the court

concludes that defendant is entitled to summary judgment. Although defendant undoubtedly used poor judgment in threatening to kill plaintiff if she did not obey his unclear commands, he cannot be held liable in damages. There are no factual disputes, and defendant is entitled to judgment as a matter of law on all of plaintiffs' claims.

Plaintiffs' § 1983 claims (the first and second claims of the complaint) boil down to the argument that defendant used excessive force by (1) pointing his gun at plaintiff Willis-Abner, and (2) threatening to shoot her. Plaintiff Willis-Abner does not mention her allegations regarding the handcuffs being applied too tightly or her confinement in defendant's patrol car in her discussion of these claims. *See* Pltf's Resp. Br., pp. 4-13. Further, plaintiffs appear to concede that defendant was entitled to conduct a *Terry* stop based on the information he obtained from the LEIN. Therefore, the court concludes plaintiffs have abandoned any fourteenth amendment claim that may have been asserted in ¶ 32 of the complaint. The sole constitutional issue is whether defendant violated plaintiff Willis-Abner's fourth amendment right to be free from an unreasonable seizure, i.e., one carried out with excessive force. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach").

In assessing the reasonableness of the force by a police officer in a particular case, the court is guided by the following principles:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful

5

> balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (citations omitted).

Viewing the facts and circumstances of the present case from the perspective of a reasonable officer in defendant's position, the court concludes that the amount of force used by defendant was constitutionally permissible. Defendant had reason to be believe that the vehicle he was stopping was stolen. He had been trained that stopping a suspected stolen vehicle involves a high level of risk, given the nature of the offense. Before stopping the vehicle, defendant drove along side it and could see there was an adult in the front passenger seat. The presence of a passenger heightens the risk to the officer. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer"). Defendant could not see into the back seat because the windows were darkly tinted, and

he therefore could not know whether it contained other passengers.

Under these circumstances, defendant was entitled to stop the vehicle, order the occupants out, and handcuff them while the status of the vehicle was clarified. Until plaintiff was out of the car and handcuffed, defendant was entitled to point his gun at her[1] in order to ensure his own safety. The Sixth Circuit has held that officers may point their guns and use handcuffs during an investigatory stop. *See Dorsey v. Barber*, 517 F.3d 389, 401-402 (6th Cir. 2008); *Humphrey v. Mabry*, 482 F.3d 840, 849 (6th Cir. 2007); *Houston v. Clark County*, 174 F.3d 809, 815 (6th Cir. 1999); *Leber v. Smith*, 773 F.2d 101, 105 (6th Cir. 1985). *See also Crisp v. City of Kenton*, 1998 WL 180561, at *5 (6th Cir. Apr. 8, 1998) (affirming summary judgment for defendant officers who pointed their guns at a burglary suspect while another officer handcuffed him). The court notes that defendant did not fire his gun or harm plaintiff, that defendant had his gun drawn for at most three minutes, and that plaintiff was handcuffed for at most ten minutes. As a matter of law, defendant did not use constitutionally excessive force by ordering plaintiff out of the car and pointing his gun at her until she was handcuffed.

The other aspect of plaintiff's excessive force claim is that defendant twice threatened to shoot her. As noted above, defendant ordered plaintiff to step out of her vehicle and "face forward." When plaintiff failed to immediately comply with this ambiguous command, defendant shouted, "I'm not kidding you, I'll kill you right here. Turn around, your cars stolen. Turn around,

---

[1] Defendant testified that he never pointed his gun at plaintiffs, but rather kept it in a "low ready position." Dft's dep., p. 35. Plaintiff testified that the officers' "weapons were trained on me." Pltf's dep., pp. 30, 36-37. For present purposes, the court assumes that defendant pointed his gun at plaintiff from the time she got out of her car until the time she was handcuffed. The videos submitted as Ex. 9 to defendant's summary judgment motion do not show Parsons holding a gun except as he approached the car after plaintiff was handcuffed, and during this time his gun was pointed at the ground.

turn around, turn around. Hands up. Face the front of your truck. You will die right here if you don't face the front of your truck." Dft's Ex. 7. Defendant testified he made these threats "[s]o she would comply with my commands." Dft's dep., p. 55. Plaintiff testified she was "scared to death" and "I kind of knew that if I don't turn the right way, I could be shot dead here in front of my children on the ground for who knows what." Pltf's dep., pp. 31, 40.

Shortly after her encounter with defendant, plaintiff filed a citizen's complaint with the Farmington Hills police department. As part of this investigation, Department Training Officer Brian Bastianelli reviewed the video and audio recordings and then submitted a report in which he assessed defendant's actions. Bastianelli's comments regarding the death threats are worth quoting at length:

> Communication
>
> Effective communication by the officer is essential while issuing verbal commands during high risk stops. Due to the potential for danger, stress levels can be high for both the officer(s) involved and the stopped subject(s). Confusion certainly can be an expected reaction by the stopped subjects. Especially in a case such as this where a citizen is exposed to the harsh effects of the most extreme level of officer safety precautions/tactics. Verbal commands issued by the officer who initiated the stop should be given in a concise, clear manor [sic]. In no way are the statements, "I'm not kidding, I'll kill you right here" or "you will die right here if you don't face the front of your truck" appropriate when trying to gain verbal control over a resistive subject. These types of statements are badly chosen for several reasons:
>
>> 1. Lethal force is not even remotely indicated when an officer is faced with what is perceived to be verbal noncompliance. In this case it appears that the driver was compliant but confused with Officer Parson's verbal commands. There was no aggressive action or gesture by the driver apparent on the video that would lead an officer in the same circumstance to feel that a lethal encounter was imminent. By all accounts, the occupants of the vehicle were verbally compliant.

8

> 2. Per department policy, duly sworn law enforcement officers of this department are authorized to use deadly force only when it is reasonable and necessary to protect the officer or others from an imminent danger of death or serious physical injury. Threats given verbally of this authority in situations that do not warrant such actions often lead to an escalation of the situation that can result in great harm to the reputation of the department and established community relations.
>
> 3. Threats of lethal force made in this context by police officers are never indicated. Should lethal force need be utilized by a police officer in a completely justifiable scenario, the end result of death would never be expected. The need to use lethal force would have only been applied due to the overwhelming need to cause that person to immediately cease their potentially lethal action.

Dft's Ex. 7. Based on interviews with all of the officers involved in this incident, a review of the video and audio tapes, and Bastianelli's report, the chief of police concluded that defendant's "harsh, violent language . . . was unwarranted, unprofessional and is conduct unbecoming an officer. Your conduct did not inspire confidence and respect for the position of public trust you hold as a law enforcement officer and, [sic] it brought the department into disrepute." Dft's Ex. 7. The chief of police found that defendant violated the Law Enforcement Code of Ethics, which requires officers to treat all citizens courteously, and suspended him for 15 days.[2]

While defendant's threats to shoot and kill plaintiff clearly were unprofessional, uncalled for, and unduly harsh and aggressive, the court is unaware of any case authority supporting the proposition that verbal threats of force can violate the fourth amendment's prohibition of

---

[2]Ironically, defendant testified that from 2000 to 2005 he worked part-time as a proctor, assisting instructors at the Oakland Police Academy in teaching "[h]igh risk felony traffic stops and mechanics of arrest." Dft's dep., p. 8. The Farmington Hills police department would be well advised to ensure that all of its officers, including defendant, are trained to make such arrests properly – i.e., without using more force or threats than the circumstances warrant.

9

excessive force.[3] The three cases cited by plaintiff do not persuade the court otherwise, as they are readily distinguishable from the present case. In *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), the defendant officer put a gun to the head of a nine-year old boy, during a search of the boy's home, and threatened to pull the trigger. The boy "posed no threat to the safety of [defendant] or any other police officer present, was not actively resisting arrest or attempting to evade arrest by fleeing, and was not engaged in any assaultive behavior. . . . [Nor was he] suspected of committing a crime [or] interfering or attempting to interfere with . . . any other officers in the execution of their duties." *Id.* at 292-93. The court rejected defendant's qualified immunity defense because "his threat of deadly force – holding a gun to the head of a 9-year-old and threatening to pull the trigger – was objectively unreasonable given the alleged absence of any danger to [defendant] or other officers at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat. *Id.* at 295.

There is no comparison between *McDonald* and the present case. In *McDonald*, there was no potential threat to the officer's safety, and the plaintiff was not a suspect. In the present case, the potential threat to the officers' safety lay in the fact that a stolen car, occupied by at least two adults, was being stopped, and plaintiff was the driver of the car. In *McDonald*, the officer put a gun to the plaintiff's head and threatened to kill him for no reason, whereas in the present case defendant

---

[3]Nor is such a conclusion compelled by the fact the police chief disciplined defendant for "unwarranted, unprofessional" conduct, or by Bastianelli's conclusion that "[t]hreats of lethal force made in this context by police officers are never indicated." As defendant notes, a finding that a police officer violated department rules is irrelevant to the question of whether he violated the fourth amendment's prohibition of excessive force. *See, e.g., Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Richardson v. Bd. of Educ. of Jefferson County*, 2007 WL 2319785, at *2 (W.D. Ky. Aug. 10, 2007).

10

threatened to shoot plaintiff, a suspected car thief, if she did not obey his commands during the course of handcuffing her.

Plaintiff next cites *Black v. Stephens*, 662 F.2d 181 (3rd Cir. 1981), in which the court affirmed a jury verdict finding that a plainclothes police officer engaged in conduct that shocked the conscience, and therefore violated plaintiff's substantive due process rights. The officer, who did not identify himself, jumped out of his car, ran toward plaintiff who was stopped in traffic behind him, screamed that plaintiff was a "rotten driver," pointed his gun directly at and just 18 inches from plaintiff's head and threatened to kill him. Plaintiff's wife, who was seated behind him, was also in the direct line of fire. Neither the facts nor the claims in *Black* bear any resemblance to those of the present case.

Finally, plaintiff cites *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (*en banc*), in which the court concluded that officers used excessive force when they pointed their guns at plaintiff's head at close range while handcuffing him. The case did not involve verbal threats. The excessive force conclusion was based on the fact that "[t]he crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way. There were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff." *Id.* at 1014. The facts in *Robinson* were much different from those in the present case. Robinson was a suspected misdemeanant, while plaintiff in the present case was a suspected felon. Robinson approached the officers calmly from a distance of 135 feet, which enabled them to see that he posed no apparent danger. Plaintiff in the present case was standing next to a suspected stolen car which had tinted windows and at least one other adult passenger inside, factors which made it more difficult for the officers to assess the danger.

11

The court concludes that the amount of force used by defendant, in light of all of the circumstances of this particular case, was not constitutionally excessive. The court shall therefore grant summary judgment for defendant on plaintiffs' first and second claims.

Plaintiffs appear to have abandoned their third claim, which alleges they were "restrained . . . without probable cause." Complaint ¶¶ 38-39. Defendant makes a lengthy and persuasive argument at pages 5-9 of their summary judgment motion that, based on the information defendant obtained from the LEIN, this was a legitimate *Terry* stop. In their response brief plaintiffs make no attempt to respond. The court shall therefore grant summary judgment for defendant on plaintiffs' third claim.

Plaintiffs' fourth and fifth claims are for assault and battery. As defendant correctly notes, these claims can succeed only if plaintiffs demonstrate that the force used by defendant was excessive. *See Gaddis v. Redford Twp.*, 2004 WL 243363, at \*\*3-4 (Mich. App. Feb. 10, 2004) (a finding that the use of force was not excessive under the fourth amendment forecloses a tort claim for assault or battery); *Delude v. Raasakka*, 391 Mich. 296, 302 (1974) (officers may use whatever force is reasonable under the circumstances); *Young v. Barker*, 158 Mich. App. 709, 722-23 (1987) (assault and battery claims fail if the force used was reasonable). Plaintiffs have not responded to this argument. As the court has concluded that defendant did not use excessive force, plaintiffs' assault and battery claims are foreclosed. The court shall therefore grant summary judgment for defendant on plaintiffs' fourth and fifth claims.

Finally, plaintiffs' sixth and seventh claims are for the intentional and reckless infliction of emotional distress. The Michigan Court of Appeals has stated:

> In order to establish intentional or reckless infliction of emotional
> distress, a plaintiff must show "(1) extreme and outrageous conduct,

> (2) intent or recklessness, (3) causation, and (4) severe emotional distress." Liability attaches only when a plaintiff can demonstrate that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." A defendant is not liable for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."
>
> The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community "would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" In reviewing claims of intentional or reckless infliction of emotional distress, it is generally the trial court's duty to determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Where reasonable minds may differ, whether a defendant's conduct is so extreme and outrageous as to impose liability is a question for the jury.

*Lewis v. LeGrow*, 258 Mich. App. 175, 196-97 (2003) (citations omitted).

In the present case, plaintiffs contend that defendant's behavior was outrageous because:

> With his gun at an unarmed mother of two, he twice threatened to shoot and kill her, in front of her children, for doing nothing other than attempting to follow his confusing, non-specific and inarticulate commands. After putting her in actual fear of her life for no justifiable reason, he then made her stand in front of him and get down on her knees and applied the handcuffs too tightly.

Pltfs' Resp. Br. at 14. If the record supported this portrayal of defendant's actions, the court would deny defendant's motion and permit this claim to be decided by a jury. However, the undisputed evidence of record paints a much different picture. Defendant had no way of knowing that plaintiff was unarmed, or that she was a mother of two, or that her children were in the back seat of the car, or that plaintiff had "done nothing." Rather, defendant had presumptively accurate information from the LEIN that plaintiff was driving a stolen car. He was entitled to assume the occupants of such a car may be armed. He had driven alongside the car before stopping it and seen that the car had at

13

least one other adult passenger, but he could not see the children or the balloons in the back seat because the back windows were tinted. For these reasons, and as discussed in greater detail above, defendant was certainly justified in stopping the car, ordering plaintiff to step out, and handcuffing her.[4]

Again, the troubling aspect of this traffic stop is that defendant threatened to kill plaintiff when she did not immediately obey his command to "face forward." This command was ambiguous. He then repeated the threat while clarifying the command: "You will die right here if you don't face the front of your truck." As noted above, it was highly unprofessional of defendant to make these threats, as they served only to needlessly frighten plaintiff – and, unbeknownst to defendant, the two young children in the back seat – rather than bringing a potentially dangerous situation under control. The chief of police strongly criticized defendant, in writing, for his "unwarranted, unprofessional" conduct, and suspended him for 15 days. Nonetheless, in light of the fact that the threats were made in the context of a traffic stop involving a suspected stolen vehicle, the court cannot say that defendant's threats were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." The court shall therefore grant summary judgment for defendant on these claims.

For the reasons stated above,

---

[4]Plaintiff testified she thought defendant handcuffed her, but in fact it was Officer Rohrer who did so. *See* dft's dep., p. 47; Rohrer dep., p. 12; Kemp dep., p. 5; Lieutenant Koehn's report, p. 3 (noting that Officer Tobin's video recording of the incident showed Rohrer handcuffing plaintiff); dft's August 4, 2004, report, p. 2; Rohrer's August 5, 2004, report, p. 1; Tobin's August 4, 2004, report, p. 1. Therefore, any claim that the handcuffs were too tight cannot be directed at defendant.

14

IT IS ORDERED that defendant's motion for summary judgment is granted.

Dated: June 13, 2008  
    Detroit, Michigan

　s/Bernard A. Friedmdan　  
BERNARD A. FRIEDMAN  
CHIEF UNITED STATES DISTRICT JUDGE

## PROOF OF SERVICE

I hereby certify a copy of this Order was served upon Counsel of Record on this date.

Dated: June 13, 2008

  s/Carol Mullins　  
Case Manager